#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **CATHY SUE GIFFROW,** | ) | **CASE NO. 4:10CV3166** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.,* and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

### PROCEDURAL BACKGROUND

The Plaintiff, Cathy Sue Giffrow, filed for disability and SSI benefits on September 6, 2006. (Tr. 184-93.) Giffrow alleges that she has been disabled since October 20, 2005. (Tr. 209.) The Appeals Council denied Giffrow's request for review. (Tr. 1-5.) An administrative hearing was held before Administrative Law Judge ("ALJ") Jan E. Dutton on July 22, 2009. (Tr. 22-66.) On August 3, 2009, the ALJ issued a decision concluding that Giffrow is not "disabled" within the meaning of the Act and therefore is not eligible for either disability or SSI benefits. (Tr. 9-21.) The ALJ determined that, although Giffrow suffers from severe impairments and is unable to perform her past relevant work, she can perform other jobs classified as "light work." (Tr. 19-21.) On June 24, 2010, the Appeals Council denied Giffrow's request for review. (Tr. 1-3.) Giffrow now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1.)

Giffrow claims that the ALJ's decision is incorrect because the ALJ failed to: (1) give controlling weight to the opinion of her treating physician, Benjamin O. Martin, M.D.; (2) explain why weight was not given to Dr. Martin's opinion; and (3) properly apply the factors set out in *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984).

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

**Documentary Evidence**

Giffrow was born in 1966. (Tr. 184.) Although she alleges that her disability began on October 20, 2005, she amended her alleged disability onset date to August 1, 2006. (Tr. 28, 91, 189.) Giffrow alleges disability due to a right knee injury, anxiety, diabetes with high blood sugar levels, panic attacks, and hypertension. (Tr. 209, 235, 264.)

Giffrow was terminated from her last job as a convenience store assistant manager on October 20, 2005. (Tr. 12, 31-32.) Giffrow lives with her husband and four of her five children. (Tr. 31.)

In September 2005, Giffrow sought treatment in the emergency room for right knee pain, and an X-ray showed early osteoarthritis. (Tr. 293, 301-03, 355, 393.) A magnetic resonance imaging scan ("MRI") showed mild narrowing in the right knee medial compartment and suboptimal delineation of the ACL. (Tr. 287-88, 391-92.) In November 2005, surgeon Steven Stokesbary, M.D., performed a successful arthroscopic repair of the right knee. (Tr. 304, 397-98.) During a pre-operative evaluation on November 17, 2005,

Benjamin Martin, M.D., diagnosed right knee pain, obesity, well-controlled hypertension, and diabetes. (Tr. 291-92, 378-80.) Dr. Stokesbary's consultation report showed appropriate mood and affect. (Tr. 309-10.)

At followup appointments during December 2005 and January 2006, Dr. Stokesbary recorded full motion of the right knee, "slow but steady progress," and he noted that Giffrow could perform activities as tolerated. (Tr. 308, 311.) The surgeon administered a steroid injection in February 2006, and the following month recorded improvement and good motion in the knee joint. (Tr. 305, 307.) At the last followup appointment in March 2006, Dr. Stokesbary thought her lingering pain was due to patellar tendonitis for which he recommended Ibuprofen and a patellar tendon strap. (Tr. 305.)

Later that year, in November 2006, Michael Baker, Ph.D., performed a consultative psychological evaluation at the state's request. (Tr. 317-20.) Dr. Baker noted Giffrow had never received treatment for a mental condition and had not seen her family physician for approximately one year. (Tr. 317, 318.) Giffrow told Dr. Baker of her increased sadness due to her mother's recent hospitalization. (Tr. 319.) The mental status examination showed normal speech, no delusional thoughts, no obvious psychomotor disturbance, and normal judgment, but also anxious mood and impaired insight. (Tr. 319-20.) Dr. Baker diagnosed panic disorder with agoraphobia, and concluded Giffrow would benefit from mental health treatment. (Tr. 320.) Dr. Baker recorded that despite the lack of treatment, Giffrow, on a daily basis, takes care of her children, performed all chores at home such as laundry, cooking, cleaning, and doing dishes. Also, Giffrow assists her husband by finding his routes on the computer, speaks to her mother by telephone, and drives to her mother's home once every two weeks. (Tr. 318.) Dr. Baker concluded: Giffrow experiences

significant problems interacting with others; her ability to understand and remember is not impaired; and her attention and concentration skills are adequate but affected by her emotional state. (Tr. 320.)

In February 2007, Willis Wiseman, M.D., performed a consultative physical examination and diagnosed degenerative joint disease of the right knee and obesity. (Tr. 338-40.) The physical examination showed a "fairly good range of motion" in both knees and no tenderness, but Giffrow walked with a marked limp of the right leg. The neurological examination showed full muscle strength and normal reflexes. (Tr. 339, 342.)

Also in February 2007, state agency medical consultant Glen Knosp, M.D., concluded, after a review of the full record, that Giffrow could perform light work. (Tr. 344-52.) In May 2007, A.R. Hohensee, M.D., performed an independent review and affirmed Dr. Knosp's opinion. (Tr. 409.)

The following month, in March 2007, GIFFROW returned to Dr. Martin for a check of her diabetes. Dr. Martin noted Giffrow's diabetes had not been checked for a long period of time, and he provided a new machine for home monitoring. He prescribed Cymbalta for depression and recommended weight loss for the right knee. (Tr. 353.) At followup appointments in April, May, and June 2007, Dr. Martin noted GIFFROW was in no acute distress and doing "fairly well" in terms of her depression. (Tr. 353, 440-41.) Medications for depression and hypertension were continued. (Tr. 353, 440-41.)

In May 2007, after a review of the record, state agency psychological consultant Jennifer Bruning Brown, Ph.D., found that GIFFROW had mild restriction in her activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 330, 408.) Dr. Brown concluded that Giffrow's

4

mental impairment, panics disorder with agoraphobia, was not of listing-level severity. (Tr. 326, 408.)

In August 2007, Giffrow's children were temporarily removed from her home due to An insect infestation. Because of this situation, from late August through November 1, 2007, Giffrow received counseling services. (Tr. 35-36, 410-25.) Also in August 2007, Dr. Martin prescribed a different medication for depression, Lexapro. In September 2007, he noted her diabetes was reasonably controlled despite Giffrow's noncompliance with her treatment. She had run out of Lexapro. (Tr. 439.)

In a letter dated November 1, 2007, the therapist reported Giffrow had made progress while regularly taking her medication for depression. The therapist recommended that the case with the state department of health and human services be closed because the home was now sanitary and Giffrow was caring for her mental health needs. (Tr. 410-11.)

In December 2007, Giffrow saw Dr. Martin, who recorded she had run out of her diabetes medication a few days earlier. Treatment notes showed Giffrow was "doing fairly well," did not have significant problems, her depression was better, and she showed "a lot of anxiety." (Tr. 438.) Her medications were continued. (Tr. 438.) On January 7, 2008, Dr. Martin completed a mental impairment evaluation and a mental capacities evaluation. (Tr. 427-33.) He opined that Giffrow's diabetes was moderately severe and "somewhat" disabling, but also that it was usually fairly well controlled with medication. (Tr. 427, 429.) Dr. Martin also opined that Giffrow's depression was "very" disabling and that despite medication and counseling, Giffrow could not handle daily activities. (Tr. 427.) He noted that Giffrow reported an inability to concentrate, do housework, or care for her younger

children. (Tr. 429.) Dr. Martin opined that any contact with people would be more disabling for Giffrow. (Tr. 427.) He concluded Giffrow could work fewer than three hours per day and no more than three days per week. (Tr. 432.)

In July 2008, Dr. Martin reported that although Giffrow was doing fairly well, she had again run out of medication. He suspected that noncompliance with medication was part of her difficulty. (Tr. 438.)

Also in July 2008, David Hill, Ph.D., a state agency psychological consultant, opined that Dr. Martin's January 2008 opinion and Dr. Baker's 2006 evaluation supported a finding of disability based on listing 12.06. (Tr. 442-455.) However, Dr. Hill noted that Dr. Martin's progress notes had a gap of approximately eighteen months. (Tr. 454.) Dr. Hill issued an addendum a month later, in August 2008, amending certain dates in his prior report. (Tr. 456.)

Also in August 2008, Dr. Judith Vogelsang, a state agency medical consultant, concluded Giffrow could physically perform light work during which she would be limited to, among other things, standing and walking two hours in an eight-hour work day with regular breaks and sitting for six hours with position changes and regular breaks. (Tr. 457-59.)

Four months later, in December 2008, Dr. Martin again provided Giffrow with samples of her medications.[1] (Tr. 465.) In April 2009, Dr. Martin continued Giffrow's medication for depression and anxiety, again providing samples. (Tr. 465-66.) His April 20, 2009, treatment notes showed Giffrow experienced stress and anxiety "due to the

---

[1] Dr. Martin repeatedly stated in Giffrow's medical records that she said she could not afford medication and she often ran out of her medication before her office visits. He often gave her samples. On April 20, 2009, he notes that she "declines secondary to monetary reasons." (Tr. 466.)

6

government not giving her social security." (Tr. 466.) Treatment notes from May 2009 showed improvement in blood sugar levels and good control of Giffrow's other physical conditions. The only mention was made of depression or anxiety during May 2009 was reported stress during one weekend. (Tr. 462, 470.)

**Plaintiff's Testimony**

At the administrative hearing, Giffrow testified that she was forty-two years old, graduated from high school, and lives with her husband and four of her five children. The fifth child lives in a basement apartment below Giffrow's home. (Tr. 30-31.) Her husband is a truck driver and is away from home between one to two months at a time. (Tr. 31, 35.) Giffrow testified that she has worked as a mail carrier, on a production line, and as a home daycare provider. (Tr. 31.) Between 1995 and 1999 she did not work because the family was able to live on her husband's income. She stated she was terminated from her last job as assistant manager at a convenience store in 2005. She suffered an injury to her right knee at her last job. She did not receive worker's compensation due to her injury or unemployment insurance when she was terminated. (Tr. 32.)

After her termination Giffrow applied for disability benefits and did not seek another job. She testified that she could not work because she had a hard time leaving the house and being around people, and because her high blood sugar levels caused dizzy spells that would not allow her to drive. (Tr. 33, 37.) She explained that these symptoms started, but were not "real bad" until she stopped working. (Tr. 33.)

Giffrow's daily activities include doing laundry, making her children's meals, housecleaning, and helping her husband for one or two hours per day find routes on their computer. (Tr. 38.) She also goes to the store, occasionally visits her mother and helps

her with gardening. (Tr. 38, 46.) She has a driver's license, but she said she rarely drives due to dizzy spells. (Tr. 34.)

Giffrow received counseling, paid for by Medicaid and required by the state, between July and October 2007, when her children were removed from her home due to a cockroach infestation. (Tr. 35, 41.) She said she stopped counseling when her Medicaid ended because she has no health insurance and could not afford to continue. (Tr. 35.)

Giffrow weighed 240 pounds at the time of the hearing, and she noted she had lost 200 pounds during the years before the hearing. She testified she was able to walk about two blocks. (Tr. 37.)

Giffrow testified she was taking the following medications at the time of the hearing: insulin; Metformin, also for diabetes; Diovan, for high blood pressure; and Lexapro, for depression and anxiety. She said she experiences memory loss as a side effect to her medication. (Tr. 39.) Giffrow receives her diabetes medication and treatment through a grant program, and her depression medication through samples from her doctor. She did not explain how she receives her high blood pressure medication. (Tr. 40.)

Giffrow described her "anxiety" as panic attacks and drastic mood swings. She said that "anything" can bring it on "anytime." (Tr. 42.) She described one occasion during which she became so anxious she had chest pains. (Tr. 43.) She testified that sometimes the attacks cause her to not be able to breathe or feel nauseous. She said she experiences anxiety attacks at least two or three, and no more than five or six, times weekly. (Tr. 44.)

Giffrow testified that she needs to elevate her leg for about thirty minutes at least three or four times each day to relieve pain, and she no longer goes upstairs in her home because her knee gives out. (Tr. 44-45.) She testified that she can stand for thirty minutes

and sit for an hour.  (Tr. 44.)  She said she has trouble lifting, but she can lift forty pounds occasionally and between ten and twenty pounds frequently.  (Tr. 45.)  Dr. Martin had not prescribed any medications for knee pain, and she takes Ibuprofen.   (Tr. 44.)

**Medical Expert's Testimony**

Thomas England, Ph.D., testified at the hearing as a medical expert.  Dr. England was allowed to ask Giffrow questions.  In response to why she did not receive treatment for her mental health issues between 2005 and 2007, she said she was afraid to leave her house.  However, she explained that she "had to" leave home to seek treatment for her knee through March of 2006 in order for her employer to pay for her medical care.  (Tr. 48.)  Dr. England also asked Giffrow whether counseling had any effect on her, and she answered that she noted slow improvement during the time she received counseling. (Tr. 48-49.)

Dr. England stated that depression had been a factor for Giffrow after March of 2007, but he noted that Dr. Martin had not made "further specification" and in fact characterized Giffrow's issue as anxiety more than depression.  Yet, Dr. England noted that Dr. Martin prescribed an antidepressant and no medications for anxiety.  He noted that part of the issue with prescribing medications for Giffrow might be cost.  Dr. England acknowledged the counselor's summary that Giffrow had made "considerable progress" when she was in counseling and her medications were not being changed.  (Tr. 50.)

Dr. England narrowed the issues presented to two potential diagnostic categories, or listings: 12.04 (depression); and 12.06 (panic disorder with agoraphobia).  (Tr. 49, 50.)  However, Dr. England concluded that, based on the medical records and testimony, Giffrow's mental impairment did not meet the criteria of any listing, and that with additional

treatment, her condition would likely "resolve fairly well." (Tr. 51.) He believes most of what Giffrow describes as panic or anxiety attacks are due to uncontrolled depression. He opined that Giffrow currently had moderate difficulties in social functioning and, in the home, mild limitations in activities of daily living and in maintaining concentration, persistence, and pace. He opined she would likely have somewhat greater limitations outside the home (Tr. 52-53.) Dr. England suggested that with adequate treatment Giffrow would be capable of sustaining routine, repetitive, unskilled work, and he would expect improved work ability with further treatment. He concluded that, at the time of the hearing, Giffrow could perform relatively low-stress work that required only minimal contact with the public. (Tr. 53.) During discussion with the ALJ about the assessments of the state agency psychological consultants and Dr. Martin, Dr. England noted that consultative examiner Dr. Baker[2] had concluded Giffrow had reasonably good concentration and attention, despite not receiving any treatment. (Tr. 53-54.) Dr. England further observed that Giffrow's counselor had noted considerable improvement during therapy, and that Dr. Martin's progress notes dated December 31, 2007, showed Giffrow was functioning quite well. (Tr. 54.) Dr. England also outlined that Dr. Martin's treatment records showed diabetes as the primary concern, and noted Dr. Martin had made no referrals for counseling or psychiatric evaluation or assessment, as would be expected if psychological symptoms were not being adequately controlled. (Tr. 55.)

---

[2]The transcript erroneously refers to Dr. "Blake." (Tr. 53.)

**Vocational Expert's Testimony**

A vocational expert, Michael McKeeman,[3] testified in response to a hypothetical question posed by the ALJ that assumed an individual of Giffrow's age, education, and work history. (Tr. 58-60.) The individual could perform a reduced range of light work that was routine, repetitive, and unskilled, and did not require more than occasional social interaction. (Tr. 59-60.) The vocational expert testified that such an individual could perform both light and sedentary unskilled jobs, including bookkeeper, office clerk, credit authorizing checker, maid/housekeeper, food preparer, and packager. All of the named positions are available locally and nationally in significant numbers. (Tr. 60-62.) However, if Giffrow's testimony was considered as credible, she would not be able to do any of the listed unskilled jobs. (Tr. 63.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920,[4] the ALJ concluded that Giffrow was not disabled in either the disability or the SSI context. (Tr. 21.) Specifically, at step one the ALJ found that Giffrow has not performed substantial gainful work activity since her onset date of August 1, 2006. At step two, the ALJ found the following medically determinable impairments: degenerative joint disease of the right knee, status post arthroscopic surgery performed in November 2005; diabetes mellitus; obesity; depression; and anxiety. At step three, the ALJ found that

---

[3]McKeeman's curriculum vitae appears in the record. (Tr. 142-46.)

[4]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, in making further references to the social security regulations the Court will only refer to disability regulations.

Giffrow's medically determinable impairments, either singly or collectively, did not meet Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 12.) The ALJ determined that Giffrow had the residual functional capacity ("RFC") to: lift and carry up to twenty pounds occasionally and ten pounds frequently; stand, sit and walk for six hours in an eight-hour workday; occasionally perform postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling. He also determined: she cannot use pedals or foot controls with her right leg or work on ladders, ropes, or scaffolds; and due to her mental limitations she is limited to routine, repetitive, unskilled work that requires no more than occasional social interaction with coworkers, the general public, or supervisors. (Tr. 13.) At step four, the ALJ determined that Giffrow did not possess the RFC to perform her past relevant work as a cashier/checker, convenience store manager, school cafeteria cook, mail carrier, or production helper. (Tr. 19.) The ALJ concluded that Giffrow could perform light and sedentary unskilled jobs such as bookkeeper, office clerk, credit authorizing checker, maid/housekeeper, food preparer, and packager. In summary, the ALJ found that Giffrow was not disabled for purposes of disability or SSI. (Tr. 20.) The ALJ found that Giffrow met the insured status requirements of the SSA through December 31, 2010. (Tr. 11.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo.* Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue,* 499 F.3d 835, 839 (8th Cir. 2007).

"'Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.'" *Slusser v. Astrue,* 557 F.3d 923, 925 (8th Cir. 2009) (quoting *Gonzales v. Barnhart,* 4654 F.3d 890, 894 (8th Cir. 2006)). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue,* 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Fredrickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004).

**DISCUSSION**

**I.    Treating Physician's Opinion**

Giffrow argues that the ALJ erred by not accepting the opinions of her treating family practitioner, Benjamin O. Martin, M.D., as controlling. Alternatively, Giffrow argues that Dr. Martin's opinions should have been analyzed and given an appropriate amount of weight.[5] Giffrow adds that the ALJ did not follow the requirements of Social Security Ruling ("SSR") 96-2p and in rejecting Dr. Martin's opinions regarding mental limitations only stated that his opinions were unsupported by his treatment notes, which did not address the "listing-level severity of her mental symptoms." (Filing No. 10, at 11.) Giffrow states that the ALJ failed to include any discussion as to whether Dr. Martin's opinions are consistent with substantial evidence in the record.

---

[5] In her brief, Giffrow's attorney cites to 20 C.F.R. § 416.927, which applies to SSI determinations. The companion regulation that applies to disability determinations, 20 C.F.R. § 404.1527, is considered in the discussion of this issue.

13

20 C.F.R. § 404.1527(d)(2) provides that a treating physician's opinion is given controlling weight if "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."

Section 404.1527(d)(2) states that in evaluating a treating source's opinion, the following factors are considered: length and frequency of treatment by the physician; the nature and extent of the treatment relationship; the degree of medical evidence supporting the opinion; the consistency of the opinion with the record as a whole; whether the treating source is a specialist in the area in question; and other factors brought to attention.  20 C.F.R. § 404.1527(d)(2)(i) & (ii), (d)(3)-(6).

Social Security Ruling 96-2p provides:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well- supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

>6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.
>
>7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

SSR 96-2p, 1996 WL 374188, at *1 (Soc. Sec. Admin. July 2, 1996).

The ALJ's rejection of Dr. Martin's statements regarding Giffrow's alleged disability is based on, and is supported by, numerous parts of the record. Giffrow primarily sought treatment from Dr. Martin, a family practitioner. The record is replete with evidence inconsistent with Dr. Martin's opinions, as noted in the factual summary of the record above. For example:

- Giffrow performs basic chores such as her own personal care, daily care of her four children, laundry, cooking, house cleaning, doing dishes, assisting her husband by using a computer a couple of hours per day, grocery shopping, and occasional gardening;
- Giffrow's arthroscopic surgery on her knee was successful, her range of motion and muscle strength were good, and for any pain her orthopedic surgeon recommended Ibuprofen and a patellar tendon strap;
- to her credit, Giffrow has lost a very substantial amount of weight, at the time of the hearing she continued to lose weight, and weight loss should help her health issues;
- Giffrow's diabetes is well controlled with proper use of her medication;
- while Dr. Martin stated Giffrow was disabled due to depression and anxiety, he primarily treated her for physical ailments, rarely mentioned depression in his treatment notes though he prescribed an antidepressant, did not prescribe an anti-

anxiety medication, and did not refer her to another care giver for mental health treatment;

- Dr. Martin's January 2008 opinion differed significantly from his treatment notes;

- Dr. Martin's opinions were generally based on Giffrow's subjective complaints;

- the record includes other medical opinions, for example those of Drs. Baker and England, which are more consistent with the record;

- when Giffrow received psychological counseling and took her psychotropic medications, she made progress with her mental health condition; and

- Dr. Martin often noted that Giffrow was noncompliant with treatment insofar as she let her medications lapse.

For these reasons, the Court concludes that the ALJ was correct in not giving controlling weight to Dr. Martin's opinion as Giffrow's treating physician. The ALJ considered the necessary factors in determining how much weight to give to his opinion. Giffrow's argument that the ALJ did not adequately discuss Dr. Martin's opinions is misplaced. His opinions, and why they were given little weight, were considered in the ALJ's four-page discussion of the medical evidence.

**II.    Polaski**

Giffrow argues that the ALJ failed to consider the factors set out in *Polaski* relating to: her daily activities; the duration, frequency and intensity of pain; dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; and functional restrictions when evaluating her subjective complaints, or related inconsistencies.

There is no requirement that an ALJ cite the *Polaski* decision or discuss every *Polaski* factor. It is sufficient if *Polaski* factors are referenced and considered and that an ALJ's credibility findings are adequately explained and supported. *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000).

In this case, the ALJ cited to the applicable Social Security regulations. Judge Dutton listed and discussed the five steps of the required sequential evaluation process for determining whether an individual is disabled. She then set out his detailed findings of fact and conclusions of law in which she considered each of those required steps. In doing so Judge Dutton made detailed references to the medical record in discussing the regulations, inconsistencies with Giffrow's subjective complaints of pain and Dr. Martin's opinions. The *Polaski* factors were considered.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1. The Commissioner's decision is affirmed;

2. The appeal is denied; and

3. Judgment in favor of the Defendant will be entered in a separate document.

DATED this 5th of May, 2011.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge